UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

Shreveport Division

| | | |
|---|---|---|
| **REGINALD SHORT** | * | **CIVIL ACTION NO:** |
| | * | |
| VS. | * | |
| | * | **JUDGE:** |
| **HONEYWELL INTERNATIONAL, INC.,** | * | |
| **AS SUCCESSOR IN INTEREST TO** | * | |
| **SANDIA LABORATORIES, ET AL.** | * | **MAGISTRATE:** |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**Notice of Removal**

Named Defendant, Honeywell International Inc. (incorrectly identified as successor in interest to Sandia Laboratories) (hereafter referred to as "Honeywell"), gives notice and removes this action from the 26th Judicial District Court for the Parish of Bossier, State of Louisiana, pursuant to 28 U.S.C. §§ 1331, 1332, 1441, and 1446. In support of this Notice of Removal, Honeywell represents the following:

**I.    INTRODUCTION AND PROCEDURAL REQUIREMENTS**

1.     On or about August 30, 2022, Plaintiff, Reginald Short, filed a "Petition for Damages" in the 26th Judicial District Court for the Parish of Bossier, in an action entitled *Reginald Short v. Honeywell International, Inc., as successor in interest to Sandia Laboratories, et al.*, No. C-168202. Plaintiff seeks damages for injuries allegedly sustained as the result of his occupational exposure to asbestos containing materials in the course of his work as a Nuclear Weapons Specialist at the Barksdale Air Force Base in Bossier Parish, Louisiana while he was serving in the U.S. Air Force from 1966-1970.

2. The United States District Court for the Western District of Louisiana, Shreveport Division, is the federal judicial district and division embracing the 26th Judicial District Court for the Parish of Bossier; therefore, venue is proper in this Court under 28 U.S.C. § 98(c) and 28 U.S.C. § 1441(a).

3. In accordance with 28 U.S.C. § 1446(a), Honeywell attaches a copy of the complete state court record as of the date of this Notice of Removal, including, but not limited to, all process, pleadings, and orders served upon it, as **Exhibit "A."**

4. In Plaintiff's Petition for Damages, he names four defendants:

   i) HONEYWELL INTERNATIONAL, INC., as successor in interest to Sandia Laboratories ("Honeywell");

   ii) E.I. DUPONT NEUMOURS COMPANY ("DuPont");

   iii) NOKIA OF AMERICA CORPORATION, f/k/a ALCATEL-LUCENT USA, INC., as successor-in-interest to WESTERN ELECTRIC COMPANY, sandia laboratories and BELL LABORATORIES, INC., f/k/a AT&T BELL TELEPHONE LABORATORIES, f/k/a BELL TELEPHONE LABORATORIES, and as successor in interest to Sandia Laboratories ("Nokia"); and

   iv) LOCKHEED MARTIN CORPORATION as successor in interest to Sandia Laboratories ("Lockheed").

*See* **Exhibit A**, at p. 8.

5. On September 14, 2022, Corporation Service Company, the registered agent for Honeywell, was served with process, as evidenced by the return of service filed into the state court record. *See* **Exhibit A**, at p. 11.

6. On that same date, September 14, 2022, Corporation Service Company, the registered agent for Nokia, was served with process, as evidenced by the return of service filed into the state court record. *See* **Exhibit A**, at p. 9.

7. On that same date, September 14, 2022, Corporation Service Company, the registered agent for Lockheed, was served with process, as evidenced by the return of service filed into the state court record. *See* **Exhibit A**, at p. 10.

8. As of the date of this Notice of Removal, there is no evidence in the state court record that DuPont has been served with process. *See generally* **Exhibit A**.

9. Accordingly, this Notice of Removal is timely filed, as it has been filed in this Court within thirty (30) days of service upon Honeywell of the initial pleading setting forth the claim for relief, as required by 28 U.S.C. § 1446(b). No previous application for removal has been made.

10. Nokia and Lockheed, the only other named defendants to have been served as of the date of this Notice of Removal, consent to this removal by Honeywell pursuant to 28 U.S.C. §1446(b)(2)(A). *See* Notices of Consent to Removal of Nokia and Lockheed, attached hereto as **Exhibits "B"** and **"C,"** respectively. Consent of those parties who have not been served is not required for removal. *See Johnson v. Scimed, Inc.*, 92 F. Supp. 2d 587, 588-89 (W.D. La. 2000).

11. In accordance with 28 U.S.C. § 1446(d), Honeywell will promptly give written notice of filing this Notice of Removal to all adverse parties, and will file a copy of this Notice of Removal with the Clerk of Court for the 26th Judicial District Court for the Parish of Bossier. A copy of this Notice of Filing of Notice of Removal is attached hereto as **Exhibit "D."**

## II. BASES FOR SUBJECT MATTER JURISDICTION

### A. FEDERAL QUESTION JURISDICTION: FEDERAL ENCLAVE

12. It is well settled that federal courts have subject matter jurisdiction over tort claims arising on federal lands, which is known as federal enclave jurisdiction. *Elie v. Ameron Int'l Corp.*, Civil Action No. 19-13924, 2020 WL 2554317, at *1 (E.D. La. May 20, 2020) (citing *Mater v. Holley*, 200 F.2d 123, 124 (5th Cir. 1952)).

13. Federal enclave jurisdiction is rooted in Article I, Section 8, Clause 17 of the U.S. Constitution, which provides that the United States has the power to exercise authority over forts, magazines, arsenals, dockyards, and other needful buildings, when the lands therefor are acquired by the consent of the state of their situs. *See* U.S. Const. art. I, § 8, cl. 17.

14. The Fifth Circuit has construed this to mean exclusive jurisdiction as an action "arising under the laws of the United States," within the meaning of 28 U.S.C. § 1331. *Mater*, 200 F.2d at 125. As such, the Fifth Circuit has recognized that "[e]xisting federal jurisdiction is not affected by concurrent jurisdiction in state courts." *Id.* at 125.

15. In the present case, Plaintiff asserts that he was exposed to asbestos containing products while serving in the United States Air Force as a Nuclear Weapons Specialist from 1966-1970. **Exhibit A**, at pp. 3-4. Plaintiff alleges that during most of his military service, he served at Barksdale Air Force Base in Bossier Parish, Louisiana. *Id.*

16. The Barksdale Air Force Base has a long and storied history as one of the most important military facilities in the United States throughout the 20th century, and was once the world's largest air base.[1]

17. The 22,000-acre tract of land making up the Barksdale Air Force Base was acquired by the U.S. government in 1930 via donation by the State of Louisiana, the City of Shreveport, and the Bossier Levee District.[2]

18. On November 18, 1930, the Secretary of War formally accepted the land for the future site of Barksdale Field.[3]

---

[1] *See* Don Kermath, et al., *U.S. Army Corps of Engineers Research Laboratories Special Report 96/19: The Barksdale Air Force Base Historic District*, at 15 (Dec. 1995), *retrieved from* https://apps.dtic.mil/sti/pdfs/ADA304695.pdf, attached hereto as **Exhibit "E."**
[2] **Exhibit E**, at 17; *see also Humble Pipe Line Co. v. Waggonner*, 376 U.S. 369, 370 (1964).
[3] **Exhibit E**, at 17.

4

19. The U.S. Supreme Court has recognized the Barksdale Air Force Base as a federal enclave over which the United States has exclusive jurisdiction. *See Humble Pipe Line Co. v. Waggonner*, 376 U.S. 369 (1964). In *Humble Pipe Line*, the Court outlined the history of federal government's acquisition of the land on which the Barksdale Air Force Base is located as follows:

> The United States acquired a fee simple title to the entire tract in 1930 by donations from the State of Louisiana, the City of Shreveport, and the Bossier Levee District, a state agency, for the purpose of using the land as a military base. The Government has spent huge amounts of money in creating and operating at Barksdale Field one of its most important military posts. When the State and its agencies gave the land to the United States, Louisiana law provided that the United States should have "the right of exclusive jurisdiction" over any land it "purchased or condemned, or otherwise acquired … for all purposes, except the administration of the criminal laws … and the service of civil process of said State therein…."

*Id.* at 370-71.

20. After World War II ended in the mid-1940s, tensions between the United States and the Soviet Union began to mount, as Americans turned their attention toward Russia and stopping the spread of communism, resulting in the decades-long conflict known as the "Cold War."[4]

21. Specifically, the growing tension between democratic and communist ideologies led the United States into armed and geopolitical conflicts with communist governments and uprisings throughout the world from the late 1940s through the early 1990s.[5]

22. In response to lessons learned in battle during World War II, coupled with concerns over the spread of communism, the Barksdale Air Force Base rose to prominence during the Cold War, becoming a Strategic Air Command ("SAC") Base.[6]

---

[4] *See* **Exhibit E**, at 26.
[5] The most notable armed conflicts during the Cold War period were the Korean War (1950-1953) and the Vietnam War (1955-1975).
[6] *See* **Exhibit E**, at 15, 26-31. This remained until June 1992, when the SAC was disbanded and Barksdale was reorganized into the Air Combat Command. *See id.* at 31.

23. SAC's mission was to develop an airborne capability that would provide the United States with long-range striking power.[7] To produce this power, SAC developed training programs designed to create independent fighting units and teach aerial refueling techniques, which gave the Air Force unprecedented global flexibility.[8] The newly activated Second Air Force was assigned to support SAC as the intelligence-gathering arm or the "Eyes of the Air Force."[9]

24. In 1950, General Lemay, SAC's Commander in Chief, announced a plan under which all SAC bases in the United States came under control of the Second Air Force.[10] To provide an immediate supply of atomic weaponry for the Second Air Force, the Defense Atomic Supply unit (known as "Bossier Base") was built at Barksdale in 1951, and remained in operation until 1970.[11]

25. The time during which Bossier Base was in operation at Barksdale brought about a prolific period of expanded experimentation and development of atomic and chemical warfare, particularly by the time the United States increased its involvement in the Vietnam War in 1962.[12] As such, the acquisition of the land on which Barksdale was developed, the subsequent development of the property as a preeminent Air Force base, and the operation of the Bossier Base as a Defense Atomic Supply unit within Barksdale from 1951-1970 were all carried out under the direction of the U.S. government.

26. Here, the injury at issue allegedly occurred on a government-owned, government-operated facility—the Barksdale Air Force Base. Plaintiff's injuries as alleged against Honeywell and the other named defendants are attributable to his duties and service to the U.S. Air Force from

---

[7] **Exhibit E**, at 26.
[8] **Exhibit E**, at 26.
[9] **Exhibit E**, at 26.
[10] **Exhibit E**, at 27.
[11] **Exhibit E**, at 27.
[12] *See* **Exhibit E**, at 27-28.

1966-1970. Moreover, inasmuch as Plaintiff alleges exposure to asbestos while working at the Barksdale Air Force Base, his claimed injuries occurred within a federal enclave. Furthermore, inasmuch as Plaintiff attributes his alleged injuries to the design of materials, equipment, and/or supplies at Sandia Laboratories for the Barksdale Air Force Base at the federal government's direction, such design activities would have also occurred within a federal enclave. *See Bisconte v. Sandia Nat'l Labs.*, No. 21-2133, 2022 WL 3910509, at *2-3 (10th Cir. Aug. 31, 2022) (finding federal jurisdiction existed over claim against Sandia Laboratories, a national science and engineering laboratory which operates on the Kirtland Air Force Base, a federal enclave acquired by the United States from New Mexico in 1954).

27. Noting that the United States has exclusive sovereignty in enclave areas, the Fifth Circuit has explained that "[i]t would be incongruous to hold that … [federal] courts are without power to adjudicate controversies arising there, but must relegate the parties to the courts of another sovereign for relief." *Mater*, 200 F.2d at 124.

28. Thus, claims arising from alleged injuries on federal enclaves arise "under the laws of the United States, within the meaning of 28 U.S.C. § 1331[.]" *Id.* at 125. Accordingly, this case is removable under 28 U.S.C. §§ 1331 and 1441, as federal question jurisdiction exists.

      **B.    FEDERAL QUESTION JURISDICTION: CLAIMS THAT TURN ON SUBSTANTIAL QUESTIONS OF FEDERAL LAW**

29. In addition to federal enclave jurisdiction, this action is also removable under 28 U.S.C. §§ 1331 and 1441 because it involves unique federal interests.

30. Plaintiff asserts only state law causes of action within the Petition; however, a careful review of the allegations as they relate to the named defendants reveals that the allegations will implicate federal law and Plaintiff's case will require resolution of substantial disputed questions of federal law.

31. This principle was explained by the U.S. Supreme Court in *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, wherein the Court held that:

> federal-question jurisdiction will lie over state-law claims that implicate significant federal issues. The doctrine captures the commonsense notion that a federal court ought to be able to hear claims recognized under state law that nonetheless turn on substantial questions of federal law, and thus justify resort to experience, solicitude, and hope of uniformity that a federal forum offers on federal issues[].

545 U.S. 308, 312 (2005). *See also Franchise Tax Bd. of Cal. v. Construction Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, 9 (1983) (holding that substantial federal question jurisdiction exists "where the vindication of a right under state law necessarily turn[s] on some construction of federal law.").

32. Here, adjudication of Plaintiff's state law claims depends on the resolution of substantial predicate questions of federal law. Indeed, this case concerns alleged exposure to asbestos at the Barksdale Air Force Base, at which a SAC was located from 1949-1992—during the height of the Cold War.[13] SAC was one of the Specified Commands established by the Department of Defense, and was responsible for Cold War command and control of two of the three components of the U.S. military's strategic nuclear strike forces.[14]

33. As explained in paragraphs 12-28, *supra*, the government directed increased development of atomic and chemical weaponry at the Barksdale Air Force Base during the 1960s-1970s, as part of the United States' increased involvement in the Vietnam War.

34. At all relevant times, the U.S. government identified the Armed Forces' weaponry development needs and commanded the specifications to meet those needs; particularly, in overseeing the design, procurement, and manufacture of all military supplies needed at

---

[13] **Exhibit E**, at 26, 31.
[14] *See* History, U.S. Strategic Command (current as of Jan. 2018), *retrieved from* https://www.stratcom.mil/About/History/#:~:text=SAC%20was%20created%20in%20March,the%20Joint%20Chiefs%20of%20Staff, attached hereto as **Exhibit F**.

8

government-owned facilities, such as the Barksdale Air Force Base. The federal government also directed production control and contractor oversight.

35. Plaintiff effectively challenges the design, production, and maintenance decisions as they relate to the handling of supplies required during wartime as dictated by the U.S. government. Consequently, any analysis of the alleged liability of the contractor assisting in any of these operations mandates analysis of critical national defense considerations and U.S. government action.

36. Specifically, numerous federal constitutional provisions, federal statutes, and federal regulations are central to Plaintiff's claims. *See, e.g.*, U.S. Const. art. I, § 8, cls. 11-12 ("The Congress shall have Power … To declare War … To raise and support Armies …."); 5 U.S.C. § 301 (authorizing military departments to prescribe regulations regarding the property, the conduct of its employees, the distribution and performance of its business, and the custody, use, and preservation of its records, papers, and property). It goes without saying that these laws apply to this case.

37. Thus, if Plaintiff challenges the design, construction, and maintenance of military equipment and supplies manufactured/produced at the federal government's direction, and/or the condition of the Barksdale Air Force Base where he worked, then those challenges implicate federal law.

38. In addition to these pervasive federal interests, Plaintiff's suit implicates several other federal issues as well. For example, the Petition contains, *inter alia*, allegations that could involve the U.S. government's express or implied statutory or contractual duty to indemnify its contractors under federal law. *See, e.g.*, 10 U.S.C. § 3861[15] (providing indemnity to government

---

[15] Formerly cited as 10 U.S.C. § 2354.

contractors involved in unusually hazardous activities); *see also* Armed Services Procurement Regulation ("ASPR"), ¶7-203.22: Insurance – Liability to Third Persons" (Jan. 1960), replaced by Federal Acquisition Regulation ("FAR") 52.228-7 "Insurance – Liability to Third Persons" (Mar. 1996), codified at 48 C.F.R. § 52.228-7 (providing contractors with third party insurance indemnity).

39. Moreover, this case requires interpretation and application of the Defense Production Act of 1950, 50 U.S.C. §§ 4501-4568,[16] which provides, in relevant part, that:

> no person shall be held liable for damages or penalties for any act or failure to act resulting directly or indirectly from compliance with a rule, regulation, or order issued pursuant to this chapter ….

50 U.S.C. § 4557.[17]

40. Additionally, Plaintiff's state law claims depend on the resolution of substantial predicate questions of federal law concerning the Federal Tort Claims Act's ("FTCA") "combatant activities" exception, 28 U.S.C. § 2680(j), which has been construed to preempt state tort law claims against defense contractors providing goods and services to the U.S. military during wartime. *See, e.g.*, *Moore v. Electric Boat Corp.*, 25 F.4th 30, 38 (1st Cir. 2022).

41. The military decision-making that took place during the Cold War regarding the Barksdale Air Force Base also implicates the federal constitutional doctrines of separation of powers and political question, as these military decisions are uniquely committed to the Executive Branch. As the U.S. Supreme Court stated in *Boyle v. United Technologies Corp.*, "selection of the appropriate design for military equipment to be used by our Armed Forces is assuredly a discretionary function," which courts cannot second-guess. 487 U.S. 500, 511 (1988). Courts

---

[16] Formerly cited as 50 U.S.C. App. §§ 2061-2171.
[17] Formerly cited as 50 U.S.C. App. § 2157.

have also noted that the separation of powers concern is strong in the military setting, such as here, because cases in which

> government specifications are at issue would "involve second guessing military orders, and would often require members of the Armed Services to testify in court as to each other's decisions and actions." These trials would raise concerns about their effect on military discipline, as well as on national security.

*McKay v. Rockwell Int'l Corp.*, 704 F.2d 444, 449 (9th Cir. 1983) (quoting *Stencel Aero Eng'g Corp. v. United States*, 431 U.S. 666, 673 (1977)).

42. Further, insofar as Plaintiff's suit challenges the military's decisions relating to workplace safety in a government-owned and constructed facility, an area over which the military exercises exclusive control, this case implicates additional federal interests.

43. Finally, insofar as Plaintiff challenges the activities of government contractors, these activities were and are subject to comprehensive and specific federal requirements, including but not limited to U.S. military contract requirements, procedures, protocols, and directives. Such comprehensive federal requirements further demonstrate that federal law—not state law—lies at the heart of this action. Therefore, given the pervasive federal nature of Plaintiff's claims, including the design, manufacture, packaging, storage, and/or transportation of military supplies for/at the Barksdale Air Force Base, this case unequivocally presents paramount federal questions, which must be resolved by a federal court.

    **C.**    **DIVERSITY JURISDICTION**

44. Removal of this suit is also proper because it is an action in which this Court has original jurisdiction under 28 U.S.C. § 1332(a), as it is an action between citizens of different states, and the matter in controversy exceeds $75,000.00, exclusive of interest in costs. 28 U.S.C. § 1441(a).

45. Plaintiff is a natural person. In determining diversity jurisdiction, the state where someone establishes his domicile serves as his state of citizenship. *Hollinger v. Home State Mut. Ins. Co.*, 654 F.3d 564, 571 (5th Cir. 2011). Here, Plaintiff alleges that he is "an adult resident citizen domiciled in the State of Colorado." **Exhibit A**, at p. 3. Thus, taking these allegations as true, Plaintiff is a citizen of **Colorado**.

46. Honeywell International Inc. is a corporation. For purposes of diversity jurisdiction, "a corporation shall be deemed to be a citizen of every State and foreign state by which it has been incorporated and of the State or foreign state where it has its principal place of business…." 28 U.S.C. § 1332(c)(1). Honeywell is a Delaware corporation, whose principal place of business is located in North Carolina. Therefore, Honeywell is deemed a citizen of **Delaware** and **North Carolina**.

47. Upon information and belief, E.I. Dupont Nemours Company is Delaware corporation, whose principal place of business is located in Delaware. Thus, DuPont is deemed a citizen of **Delaware**.

48. Nokia of America Corp. is a Delaware corporation, whose principal place of business is located in New Jersey. As such, Nokia is deemed a citizen of **Delaware** and **New Jersey**.

49. Lockheed Martin Corp. is a Maryland corporation, whose principal place of business is located in Maryland. Hence, Lockheed is deemed a citizen of **Maryland**.

50. Accordingly, because Plaintiff is a citizen of **Colorado**, and none of the named defendants is also a citizen of **Colorado**, there is complete diversity of citizenship between the parties in this action.

51. Additionally, while Plaintiff does not demand a specific amount of damages in his Petition for Damages, it is apparent from the face of the Petition that the amount in controversy is likely to exceed $75,000.00. In Louisiana state court cases, plaintiffs are prohibited from alleging a monetary amount of damages in the petition. La. Code Civ. Proc. art. 893. Thus, a defendant seeking to remove the case based upon diversity of citizenship must prove by a preponderance of the evidence that the amount in controversy is adequate. *Felton v. Greyhound Lines, Inc.*, 342 F.3d 771, 773 (5th Cir. 2003). To satisfy this standard, the removing defendant may support federal jurisdiction either by establishing that it is "facially apparent" that the claims probably exceed $75,000 or by establishing the facts in controversy in the removal petition or an accompanying affidavit to show that the amount-in-controversy is met. *Id.* at 773-74.

52. Here, Plaintiff seeks to recover damages for his purported contraction of mesothelioma, allegedly as a result of his occupational exposure to asbestos-containing materials. He seeks damages for: (1) conscious physical pain and suffering and mental anguish; (2) past, present, and future physical impairment; (3) disfigurement; (4) reasonable and necessary medical expenses incurred; (5) past, present, and future lost earnings and loss of earning capacity; and (6) loss of quality of life. *See* **Exhibit A**, at p. 7.

53. Louisiana jurisprudence establishes that an accumulation of general damages for the types of injuries claimed by Plaintiff (*i.e.*, contraction of mesothelioma from asbestos exposure) well exceeds $75,000.00—even before considering Plaintiff's medical expenses. *See, e.g.*, *Romano v. Metro. Life Ins. Co.*, 2016-0954, p. 13 (La. App. 4 Cir. 5/24/17); 221 So. 3d 176, 184.

54. Consequently, based upon the nature and extent of Plaintiff's alleged injuries, it is apparent from the face of his Petition that the amount in controversy will exceed $75,000.00, exclusive of interest and costs.

55. Because the parties are completely diverse and the amount in controversy exceeds $75,000, this Court has diversity jurisdiction pursuant to 28 U.S.C. §§ 1332 and 1441.

### III. CONCLUSION

56. As established herein, this action is removable based on both federal question jurisdiction and diversity jurisdiction.

57. If any question arises as to the propriety of the removal of this action, Honeywell respectfully requests the opportunity to brief any disputed issues and to present oral argument in support of its position that this action is properly removable.

58. Honeywell files this Notice of Removal without waiving its right to assert any objections, exceptions, motions, and/or defenses to Plaintiff's Petition for Damages available to it under state or federal law.

59. Honeywell reserves the right to supplement and/or amend this Notice of Removal.

**WHEREFORE**, Named Defendant, Honeywell International Inc. (incorrectly identified as successor in interest to Sandia Laboratories), prays that this Notice of Removal be deemed sufficient and that this civil action proceed in this Honorable Court.

[SIGNATURE BLOCK ON NEXT PAGE]

Respectfully submitted,

**ADAMS AND REESE LLP**

*/s/ Taylor E. Brett*
**TYSON B. SHOFSTAHL, T.A. (#21084)**
**TAYLOR E. BRETT (#36392)**
701 Poydras St., Suite 4500
New Orleans, Louisiana 70139
Telephone: (504) 581-3234
Facsimile: (504) 566-0210
tyson.shofstahl@arlaw.com
taylor.brett@arlaw.com
*Counsel for Named Defendant, Honeywell International Inc. (incorrectly identified as successor in interest to Sandia Laboratories)*

### Certificate of Service

**I HEREBY CERTIFY** that on October 5, 2022, a copy of the foregoing *Notice of Removal* has been delivered to all known counsel for all represented parties via electronic mail, U.S. Mail, commercial courier, and/or hand delivery, and that the same has been delivered to all other parties at their last known address via U.S. Mail and/or commercial courier.

*/s/ Taylor E. Brett*
**TAYLOR E. BRETT**