**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**SHREVEPORT DIVISION**

| | |
|---|---|
| **REGINALD SHORT** | **CIVIL ACTION NO. 22-5559** |
| **VERSUS** | **JUDGE EDWARDS** |
| **HONEYWELL INTERNATIONAL INC ET AL** | **MAG. JUDGE HORNSBY** |

**MEMORANDUM RULING AND ORDER**

Before the Court are two motions for summary judgment. National Technology & Engineering Solutions of Sandia, LLC ("NTESS") filed the first (R. Doc. 121). Plaintiff, Reginald Short ("Short") opposed. *See* R. Doc. 138. NTESS replied. *See* R. Docs. 139 and 140. E. I. du Pont de Nemours and Company ("EIDP") filed the second (R. Doc. 123). Short opposed. *See* R. Doc. 137. EIDP replied. *See* R. Docs. 141 and 145.

Having carefully considered the parties' memoranda, the record, oral argument, and the applicable law, the Motions are **GRANTED**.

**BACKGROUND**

**I. Factual Background**

The origins of this case date back to the Cold War. *See* R. Doc. 123-1 at 3. As early as 1946, the United States began efforts to address the growing threat of nuclear conflict. *See* R. Doc. 123-6 at 19. In July of that year, Congress passed the Atomic Energy Act, establishing the Atomic Energy Commission (the "AEC") to oversee the nation's atomic weapons program. *See id.* at 54–55. As part of that program, the AEC pursued the development of the hydrogen bomb, which required

additional research into tritium[1] production. *See id.* at 67. Accordingly, the AEC began planning the construction of a large-scale tritium production facility—the Savannah River Plant ("Savannah River"). *See id.* at 101. Savannah River was established to produce tritium and plutonium for the United States' nuclear weapons program. *See id.* at 270. With that history in mind, a brief overview of the parties and their respective roles in the nuclear weapons program is in order.

**A. NTESS**

On October 4, 1949, the AEC contracted with Western Electric Company to form the Sandia Corporation for the operation of the Sandia project, which "the Government deem[ed] … essential in the interest of the common defense and security of the United States." *See* R. Doc. 121-9 at 3–4. The "contract [was] authorized by and executed under the Atomic Energy Act of 1946." *See id.* at 3.

NTESS—Sandia Corporation's successor[2]—was the design agency for nonnuclear components of United States nuclear weapons and primarily served as a research laboratory. *See* R. Doc. 121-12 at 6; *see also* R. Doc. 121-10 at 28. Relevant here is NTESS's design of shipping containers and the internal packaging for tritium reservoirs within nuclear weapons.[3] *See id.* at 56–57. The packaging here contained insulation felt. *See* R. Doc. 121-11 at 5–6. In designing the containers, NTESS followed certain specifications, which specified that the insulation "felt shall be

[1] Tritium is a radioactive isotope of hydrogen, made of "one proton and two neutrons." *See id.* at 66. Unlike plutonium—which has a half-life of approximately 24,000 years—tritium has a half-life of only twelve years, necessitating its continuous production. *See id.*
[2] *See* R. Doc. 121-12 at 16. For consistency, we refer to the entity as NTESS throughout this ruling.
[3] As Short describes, the shipping barrels, approximately 3 feet high and 2 feet wide, contained insulation packaging along with two tritium containers. *See* R. Doc. 137-5 at 6.

ceramic fiber insulation with phenolic binder … [and] shall withstand continuous exposure of temperatures up to 2,000ºF." *See* R. Doc. 121-6 at 3. The specifications further mandated that the insulation "felt shall be refractory fiber insulation (alumina-silica or alumina-silica-chromia) with phenolic binder." *See id.* at 5–6. NTESS' corporate representative confirmed that this design would likely have been used before and through Short's military service. *See* R. Doc. 121-10 at 56.

**B. EIDP**

The AEC also contracted with EIDP on September 30, 1953, to construct and operate an atomic energy production facility given the "urgent and vital importance to the defense and security of the United States" at the time. *See* R. Doc. 123-5 at 5. This facility—Savannah River—was constructed in Aiken, South Carolina. *See* R. Doc. 123-1 at 3. At Savannah River, "EIDP produced tritium, and other nuclear materials, … and tendered those materials to the AEC." *See id.* at 4. Specifically, under the Contract, EIDP was authorized to perform "all things related to the operating" of Savannah River and was obligated to use "all reasonable efforts" to produce materials conforming to specifications mutually agreed upon by the AEC and EIDP. *See* R. Doc. 123-5 at 26.

Once the materials—either tritium or other nuclear materials—were produced, EIDP would tender them to the AEC, who "assume[d] responsibility for the care, custody, protection and transportation" of the materials. *See id.* at 27. The AEC then stored the finished materials in vaults in Building 217-F at Savannah River. *See id.* "[Building] 217-F was the only facility [at Savannah River] that was solely

controlled by the AEC. Once the product entered its separately gated area, the AEC officials accepted responsibility for its storage and shipment." *See* R. Doc. 123-6 at 283.

**C. Short**

In May 1966, Short enlisted in the United States Air Force as a nuclear weapons specialist. *See* R. Doc. 137-5 at 4. After completing several months of training, he was stationed at Plattsburgh Air Force Base in New York, where he unloaded and dismantled bombs and then replaced tritium containers within these bombs due to the short half-life of tritium and to maintain the bomb's potency. *See id.* at 6. The replacement containers arrived in shipping barrels that contained packaging. *See* R. Doc. 121-3 at 24–25. During this work, Short observed loose fibrous material around the containers, which he believed to be asbestos because he had been instructed to wear a respirator during his tasks. *See* R. Doc. 137-5 at 6–7. Once the containers were removed, Short recalled that these fibers would be released into the air and settled on surrounding surfaces. *See id.* at 7. These fibers, according to Short, were asbestos fibers that caused his mesothelioma, with which he was diagnosed in 2021. *See* R. Doc. 121-3 at 26–27; *see also* R. Doc. 137-4. In 1968, Short received a new assignment at Bossier Air Force Base in Shreveport, Louisiana.[4] *See id.* at 11. He conducted the same tasks—replacing tritium containers and servicing bombs—at

[4] Bossier Air Force Base, according to Short, is not to be confused with Barksdale Air Force Base in Bossier, Louisiana. *See* R. Doc. 137-5 at 11. Short states that the Defense Atomic Support Agency created Bossier Air Force Base for the storage of nuclear bombs. *See id.*

Bossier Air Force Base as he did at Plattsburgh Air Force Base. *See id.* at 11–13. Short was discharged from the Air Force in May 1970. *See id.* at 13.

This brings us to how these parties are tied together. Short alleges that NTESS developed and designed the tritium packaging[5], which purportedly included the asbestos-containing insulation, present in the bombs throughout the United States. *See* R. Doc. 80 at 2. Short specifically contends that the tritium containers installed in the bombs shipped to Plattsburgh Air Force Base and Bossier Air Force Base were manufactured according to NTESS's design specifications. *See id.* As for EIDP, Short alleges that EIDP manufactured, packaged, and shipped tritium components at Savannah River pursuant to NTESS's design specifications. *See id.* at 3. Further, he claims that the tritium components were incorporated into the bombs at Savannah River and later distributed to bases across the United States, namely the bases where Short was stationed. *See id.* at 3.

## II. Procedural History

As a result of these events and his diagnosis with mesothelioma, Short filed this suit on August 30, 2022, in the 26th Judicial District Court in Bossier Parish. *See* R. Doc. 1-2. It was removed on October 5, 2022. *See* R. Doc. 1. At the time Short filed his petition in state court, he named several defendants, including EIDP. *See* R.

---

[5] Short also asserts that he got the "impression" that "Sandia designed the bombs and owned them," based on information when applying for his job. *See* R. Doc. 137-5 at 11. He clarified that Sandia appeared on his job application and thus must have been "running the operation." *See* R. Doc. 121-3 at 42. And remember, NTESS is Sandia's successor. *See* R. Doc. 121-12 at 16. But Short never—based on the record—worked with nor did he otherwise interact with a Sandia employee during his service. *See* R. Doc. 121-3 at 216–218. And when asked whether he could substantiate his contention that Sandia made any bomb, Short conceded that he could not dispute that Sandia did not, in fact, make any bomb, as he lacked personal knowledge of that fact. *See id.* at 218.

Doc. 1-2 at 8.[6] However, NTESS did not come into the picture until Short's First Amended Complaint filed on November 7, 2022. *See* R. Doc. 20 at 1. Following several amended complaints and motions dismissing other defendants, Defendants filed two motions for summary judgment on July 30, 2024 and September 3, 2024. *See* R. Docs. 86 and 99. The Court denied both motions.[7] *See* R. Docs. 113 and 114.

On July 1, 2025, the Court held a status conference to discuss the immunity defense and the denials of the previous motions for summary judgment filed by EIDP and NTESS. *See* R. Doc. 117 at 1. Following the conference, the Court allowed Defendants to reurge their arguments on Short's lack of evidence and immunity, *see id.* at 1–2, and Defendants did so. *See generally* R. Docs. 121 and 123. Once the motions were filed, the Court granted NTESS's request for oral argument, *see* R. Doc. 129, which was held on February 20, 2026. *See* R. Doc. 155.

## **SUMMARY JUDGMENT STANDARD**

Under Rule 56(a), summary judgment is appropriate when the evidence shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Hyatt v. Thomas*, 843 F.3d 172, 177 (5th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A dispute is

[6] Short originally named the following entities: Honeywell International, Inc., EIDP, Nokia of America Corporation, and Lockheed Martin Corporation. *See* R. Doc. 1-2 at 8. In his Second Amended Complaint, Short named Union Carbide Corp., Dow Chemical Co., and 3 M Co. *See generally* R. Doc. 51. These defendants, except for EIDP, have since been dismissed. *See* R. Docs. 18, 43, 59 and 70.

[7] As for EIDP's motion, we denied it without prejudice due to newly submitted evidence and the lightly briefed applicability of an immunity. *See* R. Doc. 113 at 6–7. As for NTESS' motion, we found that NTESS lacked necessary evidence to be entitled to summary judgment. *See* R. Doc. 114 at 4–7.

genuine if the summary judgment evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* In evaluating a motion for summary judgment, the court "may not make credibility determinations or weigh the evidence" and must resolve all ambiguities and draw all permissible inferences in favor of the non-moving party." *Total E&P USA Inc. v. Kerr-McGee Oil & Gas Corp.*, 719 F.3d 424, 434 (5th Cir. 2013) (internal citations omitted).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting *Anderson*, 477 U.S. at 247). "The moving party may meet its burden to demonstrate the absence of a genuine issue of material fact by pointing out that the record contains no support for the non-moving party's claim." *Stahl v. Novartis Pharm. Corp.*, 283 F.3d 254, 263 (5th Cir. 2002).

If the movant meets its burden, the burden then shifts to the nonmoving party to make a showing sufficient to establish the existence of the essential elements of his claim on which he bears the burden of proof at trial. *Celotex*, 477 U.S. at 322. Thereafter, if the non-movant is unable to identify anything in the record to support its claim, summary judgment is appropriate. *Id.* at 322.; *see also Hamilton v. Segue Software, Inc.* 232 F.3d 473, 477 (5th Cir. 2000) (providing that the nonmoving party

must "show with 'significant probative evidence' that there exists a genuine issue of material fact) (citing *Conkling v. Turner*, 18 F.3d 1285, 1295 (5th Cir. 1994)).

**ANALYSIS**

In Louisiana, a plaintiff, in an asbestos case, must establish that "(1) he had significant exposure to the product complained of, and that (2) the exposure to the product was a substantial factor in bringing about his injury." *See Cortez v. Lamorak Ins. Co.*, 610 F.Supp.3d 877, 882 (E.D. La. 2022) (citing *Rando v. Anco Insulations, Inc.*, 16 So. 3d 1065, 1091 (La. 2009)) (citation modified). "Even if [a] plaintiff was only exposed to asbestos for a 'short period for an employer and he had longer exposure working for others, it cannot be said the relatively short asbestos exposure was not a substantial factor in causing his mesothelioma.'" *Williams v. Boeing Co.*, 23 F.4th 507, 512 (5th Cir. 2022) (quoting *Rando*, 16 So. 3d at 1091). To meet this burden, plaintiffs may rely on direct or circumstantial evidence. *Rando*, 16 So. 3d at 1089. Circumstantial evidence "must exclude every other reasonable hypothesis with a fair amount of certainty," but need not "negate all other possible causes." *Williams v. Taylor Seidenbach, Inc.*, 849 Fed. Appx 440, 445 (5th Cir. Feb. 26, 2021) (unpublished) (quoting *Rando*, 16 So. 3d at 1089) (cleaned up).

However, "a plaintiff's burden of proof against multiple defendants in a long-latency case, such as a tort claim for mesothelioma, is not relaxed or reduced because of the degree of difficulty that might ensue in proving the contribution of each defendant's product to the plaintiff's injury." *Rando*, 16 So. 3d at 1091 (citing *Quick v. Murphy Oil Co.*, 643 So. 2d 1291, 1294 (La. App. 4 Cir. 9/20/94)). And, in asbestos

cases, a plaintiff must show that he was exposed to *the defendant's asbestos product*. *See Thibodeaux v. Asbestos Corp. Ltd.*, 976 So. 2d 859, 863 (La. App. 4 Cir. 2/20/08) (citing *Grant v. American Sugar Refining, Inc.,* 06-1180 (La. App. 4 Cir. 1/31/07), 952 So.2d 746) (emphasis added)).

Defendants present similar arguments in their motions. That is, Defendants argue that (1) Short has failed to present sufficient evidence that he was exposed to asbestos from a product attributable to either Defendant and (2) they are entitled to immunity. *See* R. Doc. 121 at 1; *see also* R. Doc. 123 at 1. The Court addresses each separately.

## I. Evidence of Asbestos Exposure

### A. NTESS

NTESS asserts that Short "has no evidence to support his claim that the insulation packaging material for the tritium containers he unloaded contained asbestos." *See* R. Doc. 121-12 at 6. NTESS claims that Short cannot conclude himself that the containers included asbestos because such testimony is hearsay and outside Short's personal knowledge. *See id.* at 7–8. NTESS contends instead that the insulation packaging did not contain asbestos. *See id.* In reaching this conclusion, NTESS offers Dr. Dennis Paustenbach's ("Dr. Paustenbach") opinion that "the product specification," relating to the containers, indicated "[t]he felt shall be refractory fiber insulation (alumina-silica or alumina-silica-chromia) with phenolic binder." *See* R. Doc. 121-11 at 5; *see also* R. Doc. 121-6 at 5. Dr. Paustenbach provided that "[n]one of these specifications for thermal insulation felt … include asbestos

fibers as a material component." *See* R. Doc. 121-11 at 6. Dr. Paustenbach also stated that the specifications' fibers could withstand temperatures up to 2,000ºF, while asbestos insulation can only sustain temperatures up to 1,000–1,700 ºF. *See id.* NTESS's corporate representative also testified that, based on the documents reviewed, no products at issue contained asbestos. *See* R. Doc. 121-10 at 80–85.

Short disagrees. He believes that the summary judgment record demonstrates that NTESS designed and specified tritium packaging containing asbestos. *See* R. Doc. 138 at 16. He relies on his own testimony that he was frequently exposed to asbestos containing insulation and Dr. Murray Finkelstein's ("Dr. Finkelstein") opinion of the same. *See id.* Short also claims he was told the shipping barrels, which included the tritium packaging within, contained asbestos necessitating workers to wear masks when handling them. *See* R. Doc. 121-3 at 26–27.

But NTESS quibbles with Short's testimony, arguing that a lay witness without personal knowledge cannot opine or testify as to the content and composition of the insulation. *See* R. Doc. 121-12 at 8. Short, however, states that he has personal knowledge of the asbestos-containing insulation "because it fell within the scope of his responsibilities." *See* R. Doc. 138 at 17. He also asserts that "his instruction, training manuals, and his daily duties working hands on with th[e] material" afford him personal knowledge. *See id.* Because he "was recognized for his technical knowledge and expertise[,]" Short argues that the Court should not discount his testimony as such would be an improper credibility determination. *See id.* at 18.

Beyond his awards as a nuclear weapons specialist,[8] Short grounds his claims in his training—specifically, his review of procedural materials that addressed the composition of the nuclear weapons. *See* R. Doc. 121-3 at 26–27. The issue here, however, is that Short's training included verbal instructions to wear a mask potentially for asbestos exposure. *See id.* at 29–30.[9] But "[h]earsay is not competent summary judgment evidence, unless its proponent can show that the statement can be presented in an admissible form at trial." *Miller v. Michaels Stores, Inc.*, 98 F.4th 211, 218 (5th Cir. 2024) (citation modified). Short has not shown how these instructions regarding someone advising him about asbestos and to wear a mask would otherwise be admissible at trial. In this absence, we cannot consider such evidence. *See Oddo v. Asbestos Corp.*, 173 So. 3d 1192, 1208 (La. App. 4 Cir. 8/20/15), *writ denied*, 180 So. 3d 308 (La. 11/6/15) (plaintiffs failed to show that they were exposed to an asbestos-containing product without expert testimony or direct evidence of asbestos).

Thus, we can only consider Short's testimony—based on his training as a nuclear weapons specialist—that the insulation contained asbestos, *see* R. Doc. 121-

[8] That he was "a decorated nuclear weapons specialist in the United States Air Force" has little bearing on whether Short can opine on the content and composition of the insulation and whether it contained asbestos. *See United States v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004) ("Of course, the unremarkable observation that an expert may be qualified by experience does not mean that experience, standing alone, is a sufficient foundation rendering reliable *any* conceivable opinion the expert may express.") (emphasis in original); *see also Interra Int'l, LLC v. Al Khafaji*, No. 16-1523, 2019 WL 13023729, at *3 (N.D. Ga. Mar. 21, 2019) ("While an expert's qualifications may bear on the reliability of his proffered testimony, qualifications alone do not guarantee reliability.").

[9] Specifically, when asked about why he wore a mask when removing the tritium from the container, Short answered, "I – I was told that the – I guess I read there that the – I guess what we read as part of the procedures is because of – we wore the mask because of the asbestos exposure." *See* R. Doc. 121-3 at 29.

3 at 26–27, which "is so sadly lacking as to be mere guesswork." *See Allen v. Pa. Eng'g Corp.*, 102 F.3d 194, 199 (5th Cir. 1996); *see Steib v. Lamorak Ins. Co.*, 365 So. 3d 745, 757 (La. App. 4 Cir. 2/3/21), *writ denied*, 317 So. 3d 326 (La. 6/8/21) ("The mere possibility or conjecture that the insulation contained asbestos is speculative and insufficient to establish exposure.") (citation omitted).

Short also relies on Dr. Finkelstein's opinion that "Short's exposure to asbestos insulation used to package tritium was a substantial contributing factor to the development of his … mesothelioma." *See* R. Doc. 138-12 at 6–7. But Dr. Finkelstein only reviewed Short's medical records, answers to interrogatories, and Short's deposition. *See id.* at 4. And his opinion appears to rest primarily—if not exclusively—on Short's deposition testimony. *See id.* at 6. We have already addressed the deficiencies in Short's testimony. And, while Dr. Finkelstein's testimony may contribute to a finding that Short developed mesothelioma from some asbestos, his testimony does not create a disputed fact as to whether Short encountered asbestos from a NTESS designed product during his military service. *See Steib, v. Huntington Ingalls, Inc.,* No. 24-2486, 2026 WL 1179519, at *7 (E.D. La. Apr. 30, 2026).

To bolster his testimony, Short relies heavily on *Rando*, 16 So. 3d 1065. He asserts that "Louisiana courts recognize that unlike asbestosis, mesothelioma can develop after fairly short exposures to asbestos." *See* R. Doc. 138 at 16. However, at oral argument, Short expanded his view of *Rando* and argued that the *Rando* court allowed the plaintiff to testify that he performed jobs in the vicinity of work involving insulation that contained asbestos. True, the plaintiff in *Rando* testified that the

product at issue contained asbestos. *See Rando*, 16 So. 3d at 1089. But the story does not end there. The *Rando* court explained:

> Rando himself testified he thought asbestos was being used in the construction project at Shell because there were high temperature lines involved. As the record shows, it is assumed if the pipe held heat it was insulated. Moreover, the record indicates Dr. Richard Lemen, Rando's expert in the field of industrial hygiene and epidemiology, opined asbestos was commonly used on high temperature insulation lines at the time of this work, that high temperature pipe covering block insulation contained asbestos, and asbestos cement was used to connect pipes. Finally, samples of the insulation used in each unit at Shell indicated the presence of asbestos.

*Id.* Thus, the *Rando* court had more than the plaintiff's own testimony to rest on. The court also had plaintiff's detailed expert testimony on the conditions and sources of asbestos and samples of insulation indicating the presence of asbestos. *See id.* Did Short present an expert to opine on the composition, conditions, or sources of asbestos in the insulation—as NTESS did? No. Did Short provide the Court with any samples, materials, or any documents on the presence or absence of asbestos in the insulation—as NTESS did? No.

Even if we relied on Short's "guesswork" and read *Rando* as Short does, Short still failed to address the specifications offered by NTESS or NTESS's expert addressing the lack of asbestos. The packing materials' specifications, dated April 4, 1966, plainly provides that "[t]he [insulation] felt shall be ceramic fiber insulation with phenolic binder." *See* R. Doc. 121-6 at 2–3. Again, Dr. Paustenbach, NTESS's expert, opined that "[n]one of these specifications for thermal insulation felt … include asbestos fibers as a material component," explaining that the specified fibers could withstand temperatures up to 2,000°F, whereas asbestos insulation can sustain

only 1,000–1,700°F. *See* R. Doc. 121-11 at 5–6. And NTESS' corporate representative confirmed that this design would likely have been used during Short's military service. *See* R. Doc. 121-10 at 56.

The issue, however, is whether Short has raised a genuine dispute that the insulation contained asbestos in the face of NTESS's affirmative design evidence. He has not. Short has done no more than place himself at the Air Force bases where shipping barrels filled with tritium containers were present. *See Joseph Raymond Steib, Sr.*, 2026 WL 1179519, at *5 ("Evidence that does no more than place a plaintiff at a worksite where defendant's products were used, without specifically placing the plaintiff around asbestos fibers emanating from that defendant's product, is insufficient to survive summary judgment.") (citing *Prive v. Eagle, Inc.*, No. 22-84, 2023 WL 2646433, at *2 (E.D. La. Mar. 27, 2023)); s*ee also Cortez v. Lamorak Ins. Co.*, No. 20-2389, 2022 WL 1320429, at *13 (E.D. La. May 3, 2022) (granting summary judgment in part due to plaintiff's failure to produce evidence showing that defendant's product design included asbestos).

At bottom, Short presented no competent summary judgment evidence—beyond his own uncorroborated testimony or "guesswork"—that the insulation in the tritium containers contained asbestos, nor did he rebut NTESS's evidence to the contrary, warranting summary judgment in NTESS' favor. *See Hayes v. Asbestos Corp.*, No. 13-2392, 2015 WL 3448623, at *5 n.42 (W.D. La. May 28, 2015) (granting summary judgment where plaintiff's evidence of exposure to asbestos from

defendant's product specifically was insufficient, notwithstanding evidence that defendant sold vehicles with asbestos-containing brake parts).

**B. EIDP**

Much like NTESS, EIDP first asserts that Short has failed to develop sufficient evidence that he was exposed to asbestos from an EIDP product—specifically, that EIDP packaged or shipped tritium containing asbestos. *See* R. Doc. 123–13 at 16. EIDP contends that Short's own testimony that he knew nothing about the shipping or delivery of the containers underscores his lack of evidence against EIDP. *See id.* EIDP further argues that Short's strict liability and negligence claims cannot survive summary judgment because Short has failed to establish either that EIDP had control over the containers or that EIDP owed him any duty. *See id.* at 17–20.

Short disagrees. He counters that the record demonstrates EIDP's role in designing the tritium shipping containers and placing asbestos insulation within them.[10] *See* R. Doc. 137 at 17. Short contends that because the Department of Defense provided EIDP with shipping instructions, and because the Savannah River Plant was the government's only source of tritium, EIDP must have designed or shipped the tritium containers. *See id.* Short believes that documents reflecting the AEC's

[10] Unlike Defendants, Short cites no particular pages in his analysis and instead directs the Court to eleven exhibits totaling more than 300 pages. Scouring the record in search of a disputed fact, however, is not our obligation. *See United States v. del Carpio Frescas*, 932 F.3d 324, 331 (5th Cir. 2019) (per curiam); *see also Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012) ("A district court's decision on summary judgment is largely controlled by what the parties presented. If somewhere in a record there is evidence that might show a dispute of material fact, the district court needs to be pointed to that evidence as opposed to having to engage in an extensive search.").

issues with several variations of containers indicate that EIDP designed, tested, and redesigned the containers. *See id.* at 18. Short himself stated that he observed and handled asbestos in the containers. *See id.* at 20. Short also argues that EIDP packed the containers with asbestos-containing insulation. *See id.* Lastly, Short claims that EIDP owed a duty to him to exercise reasonable care in designing its shipping containers, selecting the packing materials for the containers, testing them, and warning the end users who would unpack them. *See id.*

At the outset, Short's characterizations of EIDP's role in the nuclear weapons program are notably inconsistent. That is, Short asserts that "the record demonstrates that EIDP designed the tritium shipping barrels and placed the asbestos-containing insulation in them." *See* R. Doc. 137 at 17. But, as we discussed and as far as EIDP is concerned, NTESS was the designer at issue. *See* R. Doc. 123-13 at 13.

Regardless, Short appears to narrow the inquiry as far as EIDP. Short states that "[t]he question is who designed the shipping containers, chose the materials, and packed the shipping containers," which he contends was EIDP. *See* R. Doc. 137 at 6. But, in reaching this conclusion, the bulk of evidence Short relies upon merely demonstrates that EIDP was an actor in the nuclear weapons program—not that EIDP designed or manufactured the shipping containers. *See* R. Doc. 137 at 17.[11]

[11] Most, if not all, of the evidence relied upon does not stand for the propositions Short advances. Short cites to an EIDP Board of Directors Report, which provides that "[i]n addition to being the primary reactor site for tritium production, Savannah River has the only facilities in the AEC complex for extracting and purifying tritium from the irradiated reactor targets, and for packaging he gaseous tritium into the weapon components." *See* R. Doc. 137-7 at 3. But, as EIDP points out, *see* R. Doc. 145 at 1, the tritium gas referenced was packaged into the weapon components which is separate and apart from the packaging Short observed in the shipping barrels. *See* R. Doc. 121-3 at 141 (Short testifying

For instance, Short believes that EIDP tested and modified the tritium shipping containers based partly on a communication from AEC to EIDP. *See* R. Doc. 137 at 14. But the AEC's communication with EIDP—the operator of Savannah River—regarding the shipping container inventory and recent modifications to such inventory does not identify EIDP as the designer or manufacturer of those shipping containers. *See* R. Doc. 137-17 at 2. Rather, an EIDP monthly report, which Short contends identifies EIDP as the designer of shipping containers, plainly states that "[t]he reservoir shipping container is to be supplied by ACF Industries, Albuquerque[,]" undercutting Short's contention that EIDP designed or manufactured the shipping containers. *See* R. Doc. 137-18 at 9.

Short also relies on a report, which provides that "[s]even different shipping packages for radioactive materials were developed at the Savannah River Plant." *See* R. Doc. 137-19 at 5, 8. Because EIDP was the operator at Savannah River, Short asserts that this report establishes EIDP as the designer or manufacturer of the tritium containers. *See* R. Doc. 137 at 14. But even if we assume that EIDP was the designer or manufacturer of the tritium containers, the report confirms that non-asbestos insulation was used in their construction. *See* R. Doc. 137-19 at 9–16. And Short has not produced any evidence or testimony to the contrary.

---

that the tritium canisters "were by themselves."). A communication between an operations manager and the AEC also does not identify EIDP as a designer or manufacturer of any shipping containers. *See* R. Doc. 137-9 at 8. Bare references to "distribution plan(s) for shipments," unaccompanied by the actual attachments, are insufficient to establish EIDP as the designer or manufacturer of the shipping containers. *See* R. Doc. 137-16. And, again, several documents attached only refer to EIDP as the operating entity of Savannah River, *see* R. Docs. 137-11, 137-12, 137-13, 137-14, 137-15, and 137-21, which is not in dispute here. *See* R. Doc. 123-13 at 10.

No party disputes that EIDP produced and supplied all tritium gas for the United States military for its nuclear weapons program. *See* R. Doc. 123-13 at 6; *see also* R. Doc. 137 at 5. Moreover, no dispute exists as to EIDP constructing and operating Savannah River. *See* R. Doc. 123-13 at 10. But the evidence in the record stops there as to whether EIDP attributed to Short's exposure to asbestos. "Consequently, far from 'exclud[ing] every other reasonable hypothesis with a fair amount of certainty,'" Short's evidence "leaves a key point untouched"—that an EIDP product contained asbestos. *See Williams*, 849 Fed. Appx at 447 (quoting *Rando*, 16 So.3d at 1089).

In the absence of evidence showing that EIDP produced, designed, or manufactured a product containing asbestos, Short cannot pass muster at this stage, entitling EIDP to summary judgment. *See Sanchez v. Anco Insulations, Inc.*, No. 20-2973, 2022 WL 1210570, at *8 (E.D. La. Apr. 22, 2022) ("Because plaintiffs have not created an issue of fact that Sanchez was exposed to movants' asbestos, the court need not reach their specific arguments regarding whether any such exposure was a substantial factor in causing Sanchez's mesothelioma."); *Thibodeaux*, 976 So. 2d at 867 (affirming summary judgment in favor of defendant based on plaintiff's inability to produce evidence that the defendant's products contained asbestos); *Vodanovich v. A.P. Green Indus., Inc.*, 869 So. 2d 930, 934 (La. App. 4 Cir. 3/3/04) (granting summary judgment because "the plaintiff … failed to establish any direct or circumstantial evidence of exposure to asbestos fibers released by the defendants' activities").

## II. Immunity

Defendants claim entitlement to *Yearsley* immunity. *See* R. Doc. 121 at 1 and R. Doc. 123 at 1; *see generally Yearsley v. W.A. Ross Construction Company*, 309 U.S. 18 (1940).[12] Neither Defendant moved for immunity under *Boyle*. *See generally* R. Doc. 121 and R. Doc. 123; *see generally Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988).[13] However, Short questioned whether his claims against EIDP are more appropriately analyzed under *Boyle*. *See* R. Doc. 137 at 22. Short did not address *Boyle* immunity as to NTESS. *See* R. Doc. 138.

Short is right to question whether *Boyle* is more appropriate in this case. The Third Circuit, in *Gay v. A.O. Smith Corp.*, No. 23-2078, 2024 WL 2558735 (3d Cir. 2024), recognized the unresolved issue of whether *Yearsley* or *Boyle* immunity—and whether the two are distinct doctrines—governs the liability of government contractors by explaining that "[b]oth doctrines protect government contractors from liability if certain conditions are met. But it is an open question whether *Boyle* immunity is merely the descendant of *Yearsley* immunity, or if the two doctrines are distinct." *Id.* at *2. Specifically, "[t]he application of the contractor defense in the

[12] "*Yearsley* immunity is derivative sovereign immunity. Such immunity shields contractors whose work was 'authorized and directed by the Government of the United States' and 'performed pursuant to [an] Act of Congress.'" *Taylor Energy Company, L.L.C. v. Luttrell*, 3 F.4th 172, 175 (5th Cir. 2021) (quoting *Campbell-Edwald*, 577 U.S. at 167) (cleaned up). "*Yearsley* provides protection to a contractor when it has received a lawful authorization and acted according to its terms—meaning, when the contractor has acted within legal bounds." *Geo Grp., Inc. v. Menocal*, 146 S. Ct. 774, 784 (2026).

[13] Under *Boyle.*, a contractor must show that "(1) the government must have approved 'reasonably precise' specifications; (2) the equipment must have conformed to those specifications; and (3) the supplier/contractor must have warned of those equipment dangers that were known to the supplier/contractor, but not to the government." *Kerstetter v. Pac. Sci. Co.*, 210 F.3d 431, 435 (5th Cir. 2000) (citing *Boyle*, 487 U.S. at 512).

context of military-equipment manufacturers is an area of law that has [ ] been arguably distinguished from the general *Yearsley* defense in *Boyle*[.]" *Crossland v. Huntington Ingalls, Inc.*, 635 F.Supp.3d 491, 504 (E.D. La. 2022) (quoting *Ackerson v. Bean Dredging LLC*, 589 F.3d 196, 205 (5th Cir. 2009)).

One distinction between *Boyle* and *Yearsley* can be drawn based on the nature of the contractor's relationship to the government. That is, whether the underlying contract is a procurement or performance contract. *See Cunningham v. Gen. Dynamics Info. Tech., Inc.*, No. 16-545, 2017 WL 1682534, at *4 (E.D. Va. May 1, 2017), *aff'd*, 888 F.3d 640 (4th Cir. 2018) (defining procurement and performance contracts applicable to *Yearsley* and *Boyle* immunity).

Because Defendants entered into procurement contracts with the AEC, *see generally* R. Docs. 121-9 and 123-5, we conclude that *Boyle* is more appropriate considering the facts of this case. *See Hencely v. Fluor Corp.*, 146 S. Ct. 1086, 1094–95 (2026) (observing the applicability of *Boyle* to the performance of federal procurement contracts). However, because our disposition rests on Short's lack of evidence and neither Defendant invoked *Boyle*, we need not address it further.

## CONCLUSION

For the reasons set forth herein,

**IT IS ORDERED** that National Technology & Engineering Solutions of Sandia, LLC's Motion for Summary Judgment (R. Doc. 121) is **GRANTED**, and all claims asserted against NTESS are hereby **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that E. I. du Pont de Nemours and Company's Motion for Summary Judgment (R. Doc. 123) is **GRANTED**, and all claims asserted against EIDP are hereby **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that all other pending motions are **DENIED AS MOOT.**

A judgment consistent with this Ruling will be issued separately.

**THUS DONE AND SIGNED** in Chambers this 30th day of September, 2026.

**JERRY EDWARDS, JR.**
**UNITED STATES DISTRICT JUDGE**